Richard J. COLLINS, Jr., Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

Lewis C. MURTAUGH, Trustee for Emanuel and Helen Steib, Under Declaration of Trust Dated 8/30/56, Petitioner,

v.

SECURITIES AND EXCHANGE COMMISSION, Respondent.

Nos. 75–1100, 75–1262 and 75–1263.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1975.

Decided Jan. 23, 1976.

Rehearing and Rehearing En Banc Denied Feb. 26, 1976.

Richard J. Collins, Jr., St. Louis, Mo., and Lewis C. Murtaugh, Chicago, Ill., for petitioners.

David Ferber, Securities & Exchange Commission, Washington, D. C., for respondent.

Daniel M. Gribbon, Covington & Burling, Washington, D. C., for intervenor du Pont.

Matthew J. Broderick, Philadelphia, Pa., for intervenor, Christiana.

Before HEANEY, and STEPHENSON, Circuit Judges, and TALBOT SMITH, Senior District Judge.*

HEANEY, Circuit Judge.

We review an order of the Securities and Exchange Commission exempting from the prohibition of § 17(a) of the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq., the proposed merger of Christiana Securities Company into E. I. du Pont de Nemours and Company. The Commission granted the exemption after finding the merger terms to be reasonable and fair and free from overreaching on the part of anyone concerned within the meaning of § 17(b)(1) [1] of the Act. We reverse because:

(1) The Commission's order is premised on the erroneous view that Christiana should presumptively be valued on the basis

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The Commission found the merger to be consistent with the general purposes of the Act. See 15 U.S.C. § 80a–17(b)(3). No appeal is taken from this finding. It made no finding with respect to § 17(b)(2) of the Act which requires a proposed transaction to be consistent with the investment company's policy because Christiana was proposed to go out of existence.

The Commission's decision is reported as Christiana Securities Company, Investment Company Act Release No. 8615 (December 13, 1974).

of the market value of its principal asset, common stock of Du Pont.

(2) The record as a whole does not support the Commission's finding that the terms of the merger are reasonable and fair and free from overreaching on the part of anyone concerned.

## I. STATEMENT OF UNDERLYING FACTS.

Christiana is a closed-end, non-diversified management investment company[2] registered with the Commission pursuant to the Act. It was created in 1915 as a device by which members of the du Pont family could concentrate their large holdings in Du Pont and maintain control of that company.[3] The family members contributed their Du Pont stock to Christiana in exchange for Christiana shares. Christiana now holds 13,417,120 shares of Du Pont common stock, representing twenty-eight and three-tenths percent (28.3%) of the issue.[4] It has outstanding 11,710,103 shares of its common stock and 106,500 shares of its preferred stock. Seventy-five percent (75%) of Christiana stock is held by members of the du Pont family. Ninety-five and five-tenths percent (95.5%) of Christiana's stock is held by three hundred and thirty-eight (338)

holders of one thousand (1,000) or more shares each. The remaining four and five-tenths percent (4.5%) is owned by some seven thousand six hundred (7,600) shareholders.

Christiana's stock has historically sold at a discount from the market price of Du Pont common stock. Over the two years preceding the date on which the merger negotiations were announced, the discount generally ranged from twenty to twenty-five percent (20–25%). On the date of announcement, the discount was twenty-three percent (23%). The Du Pont stock owned by Christiana has a low or zero tax basis.

Du Pont is an industrial company principally engaged in manufacturing and selling diversified lines of chemical and other related products. It has 47,445,810 shares of common stock outstanding, which are broadly and continuously traded on the New York Stock Exchange and other exchanges. These shares are owned by over 225,000 shareholders.

On April 20, 1972, Irénée du Pont, Jr., President of Christiana Securities Company, wrote to Mr. C. B. McCoy, President of Du Pont, suggesting a merger of Du Pont and Christiana.[5] As a result of this letter, nego-

---

**2.** *See* 15 U.S.C. § 80a–5.

**3.** Christiana also owns a small block of Du Pont preferred stock, two daily newspapers in Wilmington, Delaware, and three and five-tenths percent (3.5%) of the stock of the Wilmington Trust Company. These holdings, representing two percent (2%) of its total assets, are not material to the issues on appeal.

**4.** Members of the du Pont family who were directors of Du Pont or Christiana on December 31, 1971, owned an additional 426,876 shares of Du Pont common stock on that date. A request was made of the Commission by protester Murtaugh to inquire into additional stock ownership by the du Pont family. The request, in our view, was improperly rejected.

Christiana presumptively controls Du Pont. Section 2(a)(9) of the Act states: " 'Control' means the power to exercise a controlling influence over the management or policies of a company * * *." The presumption of control arises from the ownership of more than twenty-five percent (25%) of Du Pont's voting securities.

There is little doubt that, for practical purposes, the block of common stock of E. I. du Pont de Nemours & Company, held by the Christiana Securities Company carries working control over the largest chemical company in the United States.
SEC, REPORT ON THE STUDY OF INVESTMENT TRUSTS AND INVESTMENT COMPANIES: CONTROL AND INFLUENCE OVER INDUSTRY AND ECONOMIC SIGNIFICANCE OF INVESTMENT COMPANIES, H.R.Doc.No. 246, 77th Cong., 1st Sess. (1941) at 152.

**5.** Dear Mr. McCoy:

As you know, Christiana Securities Company owns approximately 28% of the outstanding common stock of the Du Pont Company. In recent years this block of stock has represented about 99% of the total assets of Christiana.

We have believed over the years that Christiana has served a desirable and useful purpose in that it has tended to contribute to the continuity of sound and able management of the Du Pont Company. But there are certain disadvantages associated with the holding of such a large block of Du Pont

tiating committees were appointed by Du Pont and Christiana. Mr. McCoy, Chairman and President of Du Pont, and Irving Shapiro, Chairman of the Finance Committee of Du Pont, were named to represent Du Pont. Edward B. du Pont and A. Felix du Pont were named to represent Christiana Securities Company.

On June 6, 1972, the special negotiating committees jointly retained Morgan Stanley & Co., the Du Pont committee retained First Boston Corporation and the Christiana committee retained Kidder, Peabody & Co., Incorporated, as financial advisers. Each financial adviser was asked to recommend a range of terms for exchange of Christiana common stock for Du Pont stock that was, in its opinion, reasonable and fair. Preliminary reports were made by the financial consultants at a joint meeting of the special committees on June 30, 1972. The final written reports were submitted on July 6 and 7, 1972. Each financial adviser recommended merger terms that approximated Christiana's net asset value.[6]

An agreement to merge was reached by the two negotiating committees on July 6, 1972, and approved by the Board of Directors of both corporations in principle on July 17, 1972. A formal plan of reorganization and agreement of merger was signed on December 20, 1972. The merger agreement provides for the issuance of Du Pont common stock equivalent in value to ninety-seven and five-tenths percent (97.5%) of Christiana's net assets after adjustment.[7] Each share of Christiana is to be exchanged for 1.123 shares of Du Pont. The preferred stock of Christiana can be converted into Du Pont common stock or redeemed pursuant to Delaware statutory procedures at $120 per share, plus accrued dividends. Common stock holders will also have appraisal rights under Delaware law.

Christiana and Du Pont submitted a joint application to the Commission for permis-

stock in this form. For example, the market price for Christiana common stock consistently is lower than the value of the underlying net assets, Du Pont dividends flowing to Christiana are subject to Federal income tax at an effective rate of 7.2%, and there are certain conditions that limit to some extent the marketability of Christiana common stock. These disadvantages may now outweigh the benefits derived from the holding of a large block of Du Pont stock by Christiana, and a merger of Christiana with Du Pont could be desirable. Such a merger could also have advantages for Du Pont. I believe a merger might be practicable on terms that would be favorable to both Christiana and Du Pont and the stockholders of both companies.

Accordingly, I plan to call a meeting of the Board of Directors of Christiana for April 28, 1972 to discuss possibilities of a merger of Christiana into Du Pont. If the Christiana Board feels that such a merger might be desirable, I anticipate that a special committee of the Board will be appointed to develop possible terms for a merger.

I would appreciate your giving consideration to this matter from the standpoint of the interests of the Du Pont Company. If you feel that such a merger could be of possible interest to Du Pont, you might wish to appoint a special committee of the Du Pont Board to discuss the matter with a special committee of the Christiana Board appointed for such purpose.

Very truly yours,
Irénee du Pont, Jr.
President

6. Morgan Stanley recommended terms ranging from a five-tenths percent (.5%) to a two and five-tenths percent (2.5%) discount from adjusted net asset value;

First Boston recommended a discount of between one and one-tenth percent (1.1%) and three and seven-tenths percent (3.7%) from adjusted net asset value; and

Kidder, Peabody recommended terms ranging from a two percent (2%) premium to a three percent (3%) discount from adjusted net asset value.

The Du Pont common stock was valued on the basis of its market quotations. This use of market price is not challenged on appeal.

7. The adjustments reflected the following:

(1) Elimination of the claim for a tax refund, with provision for contingent delivery of Du Pont shares equivalent to the value of any refund;

(2) Allowance for expenses of sale and applicable capital gains tax on disposition of Wilmington Trust Company stock and The News-Journal Company; and

(3) Allowance for expenses of prosecuting the claim for tax refund and one-half of estimated merger expenses of $1,500,000.

sion to merge on July 20, 1972. Notice of application was published on October 3, 1972. Thereafter, the protesters in this action and others filed a request for a hearing. A hearing was held before an Administrative Law Judge between February 5 to 13, 1973. The matter was argued in July, 1973. The Commission released its findings and opinion on December 13, 1974. It concluded that the statutory requirements as to reasonableness and fairness had been satisfied. The Commission subsequently denied the petitions filed by Messrs. Collins and Murtaugh seeking a rehearing and a petition by Murtaugh for leave to adduce additional evidence.

Collins filed a petition for review with this Court on February 7, 1975. Murtaugh filed a similar petition with the United States Court of Appeals for the Seventh Circuit on February 10, 1975. Murtaugh's petition was transferred to this Court pursuant to 28 U.S.C. § 2112(a).

■ In reviewing the Commission's order, we are guided by the principle that the order is not to be disturbed unless it is predicated on an erroneous view of the law or is based on factual findings not supported by substantial evidence on the record as a whole. 15 U.S.C. § 80a–42(a); *Securities and Exchange Com. v. Chenery Corp.,* 332 U.S. 194, 207, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

## II. THE COMMISSION TOOK AN ERRONEOUS VIEW OF THE LAW.

We first turn to the question whether the Commission erred in holding, as a matter of law, that Christiana should be valued at the approximate value of its net assets (the market value of the Du Pont stock held by it). The Commission stated:

> An investment company, whose assets consist entirely or almost entirely of securities the prices of which are determined in active and continous [sic] markets, *can normally be presumed to be worth its net asset value.* What better guide to its value could there be? The simple, readily usable tool of net asset value does the job much better than an accurate gauge of market impact (were there one) could. The record indicates that most of Christiana's stock is held by long-term investors. Hence there is *no pressing need to depart* from the net asset value test. (Emphasis added.)

*Christiana Securities Company,* Investment Company Act Release No. 8615 (December 13, 1974) at 23.

This statement, which appears to state a rule of law rather than a rebuttable presumption,[8] was central to the issuance of the exemptive order. It was the basis of the Commission's denial of the protester's Petition for Rehearing and Leave to Adduce Additional Evidence[9] as well as the argument stressed by the General Counsel for the Commission in its brief[10] and at oral

---

**8.** In view of the Commission's statement at n. 38 of its order, reaffirmed in its order denying the protester's Motion for Rehearing and Leave to Adduce Additional Evidence, that the questions presented were essentially legal, *see infra* at 588 nn. 9 & 10, and 589 n. 11, we believe that the principle stated must be considered as a substantive rule of law rather than a presumption. The Commission recognized at oral argument that the burden of finding the merger terms reasonable and fair is on it, not the protesters who have neither the financial nor technical means to challenge the evidence of the companies. This recognition was essential in light of the language of the statute. For a general discussion on the legal effects of a presumption, *see* 2 Davis, Administrative Law Treatise § 15.04 (1958); IX Wigmore on Evidence §§ 2490–2492 (1940).

**9.** The Commission said at n. 5:

> In footnote 38 to our opinion (Release at p. 14, 5 SEC Docket at 754) we said that "The questions presented are in our view essentially legal."

*Christiana Securities Company,* Investment Company Act Release No. 8692 (February 27, 1975).

**10.** It said:

> Realistically, Christiana must be viewed as being substantially equivalent to its Du Pont holdings, and any substantial departure from the value of that stock as a basis for valuing Christiana would ignore the economic realities.

argument.[11] The departure from net asset value reflected in the two and five-tenths percent (2.5%) discount was accepted only because of the "striking disparity between the substantial benefits to be received by Christiana and the far more modest ones inuring to Du Pont", and because it did not "divest Christiana's stockholders of a significant portion of the intrinsic investment values to which they are legally and equitably entitled." *Christiana Securities Company, supra* at 25–26.

A. The plain language of the Act does not permit the Commission to establish a rule of law that closed-end, non-diversified companies should be presumptively worth the value of their net assets.[12] The Act was drafted with a good deal of specificity. In effectuating its remedial purposes, we will not give it a construction that strains its plain meaning. *See Willheim v. Murchison*, 342 F.2d 33, 42 (2nd Cir.), *cert. denied*, 382 U.S. 840, 86 S.Ct. 36, 15 L.Ed.2d 82 (1965). Section 17(b)(1) provides:

The Commission shall grant such application and issue such order of exemption *if evidence establishes* that—

(1) the terms of the proposed transaction, including the consideration to be paid or received, *are* reasonable and fair and do not involve overreaching on the part of any person concerned; * * (Emphasis added.)

We read the section to require the Commission to find affirmatively that the terms of each merger are reasonable and fair, a requirement that must be fulfilled even though there are no protesters to the merger.[13] As was said in *Grace v. Ludwig*, 484 F.2d 1262, 1268 (2nd Cir. 1973), *cert. denied*, 416 U.S. 905, 94 S.Ct. 1610, 40 L.Ed.2d 110 (1974):

The statute here did not envisage a simple reporting procedure or the mere submission of written materials for pro forma or perfunctory review. * * * The Commission could only issue such an order if *evidence* establishes that the consideration to be paid was reasonable and

11. Counsel for the Commission said:
In economic realities what is being done here is there is being traded one share of Du Pont stock for one share of Du Pont stock, except there is a 2.5% discount, or advantage, given to the Du Pont people because they have to go and vote this thing through and agree with it. And basically this is the fundamental economic test that the Commission believes in its operation of the Act that Congress intended should be followed and that it has followed in past cases.

     *    *    *    *    *    *

The Commission *as a matter of law* feels that to allow anything significantly more than two and one-half percent discount would not be fair and that's the reason why the Commission said it isn't material to us that these negotiations were [not] conducted really at arm's length. * * * It is our responsibility to determine whether it is fair. And in determining whether it is fair the Commission feels firmly that the legal test is, is are each side getting the net value * * *. (Emphasis added.)

12. Covington & Burling, counsel for Du Pont, advised each financial adviser before their evaluations were made as follows:
In general, the Commission examines proposed transactions in the light of all relevant financial considerations. In passing on

merger terms affecting common stock, the Commission has looked to such factors as comparative earnings, dividends, market values and net asset values (including adjustments for potential taxes arising from unrealized capital gains in portfolio securities and the tax benefits resulting from tax loss carryforwards). No single factor has been considered determinative.

13. The Commission takes the position that its duty to insure fairness under § 17(b)(1) extends to the shareholders of the affiliated company as well as those of the investment company. *Fifth Avenue Coach Lines, Inc., et al.*, 43 S.E.C. 635, 639 (1967). We agree. This is consistent with the purposes of the Act, for, as stated in § 1(a)(3), investment companies may dominate and control the policies and management of companies engaged in interstate commerce. As was said in an analogous context:
[A] plan of reorganization which is unfair to some persons may not be approved by the court even though the vast majority of creditors have approved it.
*TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 435, 88 S.Ct. 1157, 1169, 20 L.Ed.2d 1 (1968) (footnote omitted) (corporate reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C. § 501 *et seq.*).

fair and did not involve overreaching * * *. (Emphasis included.)

The section does not limit the considerations relevant to the approval of a merger to the preservation of the net asset value of the investment company.

The Commission argues, however, that this result obtains when § 17(b)(1) is read in conjunction with § 2(a)(41)(B). The latter section states:

> "Value", with respect to assets of registered investment companies * * * means—
>
> * * * * * *
>
> (B) * * * with respect to securities for which market quotations are readily available, the market value of such securities; * * *

Notwithstanding the fact that market quotations for securities issued by controlled companies are available, the board of directors may in good faith determine the value of such securities: *Provided,* That the value so determined * * * is not in excess of market value in the case of other controlled companies.

But § 2(a)(41)(B) is not by itself operative, for it neither proscribes nor requires particular conduct. It is only definitional, giving meaning to the term "value" when used in the operative sections of the Act. *See, e. g.,* §§ 3(a)(3), 10(d)(4) and 18. It is not made operative by § 17(b)(1) which speaks in terms of "fairness" and not "value." Had Congress intended the construction advanced here by the Commission, there would have been no need to require the Commission to find merger proposals reasonable and fair on the basis of the evidence presented. Congress could have simply decreed that a merger of a closed-end, non-diversified investment company into its portfolio affiliate is reasonable and fair when the investment company is valued at or close to its net asset value. Congress did not do so. Further, § 2(a)(41)(B) defines the value of an investment company's assets and not its stock. In this readjustment of the ownership of Du Pont stock, we look to the value of what the Christiana shareholders are giving in the exchange, considering the net asset value of the company as one relevant factor.

The Commission's reliance on § 23(b) to support its position is also misplaced. That section states in its relevant part:

> No registered closed-end company shall sell any common stock of which it is the issuer at a price below the current net asset value of such stock * * * except (1) in connection with an offering to the holders of one or more classes of its capital stock; (2) with the consent of a majority of its common stockholders; (3) upon conversion of a convertible security in accordance with its terms; * * * (5) under such other circumstances as the Commission may permit by rules and regulations or orders for the protection of investors.

Again, the statute does not by its terms apply to the transaction here, for Christiana is not selling any stock of which it is the issuer. The harm intended to be remedied by the statute was the issuance of investment company common stock to favored persons at less than true value resulting in the dilution of the ownership equity of the existing shareholders. *See* Jaretzki, *The Investment Company Act of 1940,* 26 Wash. U.L.Q. 303, 328 (1941). That harm is not present here. The Supreme Court addressed itself to this point recently:

> In deciding whether borderline transactions are within the reach of the statute, the courts have come to inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent * * * thereby endeavoring to implement congressional objectives without extending the reach of the statute beyond its intended limits. * * * Under these strict terms, the prevailing view is to apply the statute only when its application would serve its goals.

*Kern County L. Co. v. Occidental Petroleum,* 411 U.S. 582, 594–595, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973). *Accord, Willheim v. Murchison, supra* at 42.

The Commission's discussion of § 23(b) treats Christiana as an open-end investment company. Christiana is a closed-end compa-

ny and, unlike its counterpart, its shareholders have no statutorily protected means to redeem their stock and receive their proportionate share of the company's net assets. *Cf.* 15 U.S.C. § 80a–22(e); *U. S. v. National Assn. Securities Dealers,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). Unlike the stock of an open-end company, the stock of Christiana actively trades in a secondary market that has historically imposed upon sellers a discount from net asset value. This discount is an economic fact affecting the value of its stock and cannot be ignored in determining what is reasonable and fair.

In economic fact, the shareholders of Christiana do not own the assets of their company. They, like the shareholders of any other corporation, own only a pro rata share of the assets and the income derived therefrom.[14] *See* Jaretzki, *The Investment Company Act of 1940, supra* at 304–305. It is the current worth of the Christiana stock given in exchange for the Du Pont stock that must be determined in order to pass on the reasonableness and fairness of the merger.

B. The legislative history of the Act is consistent with the view that the Commission must look to the value given and received by the respective shareholders to a merger and may not conclusively presume that mergers based on the net asset value of a closed-end, nondiversified investment company are reasonable and fair. That history envisions that the Commission's rulings under § 17(b)(1) will be preceded by an inquiry into the relevant facts that is both thorough and independent.

█ Speaking to the effects of the absorption of one company's assets into another, whether by merger, consolidation or sale of assets, the Commission said:

The ultimate result of all of these procedures is the concentration of the assets of one or more formerly independent companies in one of the old companies or in a new company. Securities of the successor company are issued for the securities of the old companies. In the achievement of this result, a nonjudicial reorganization of the rights, privileges, and financial position *of the stockholders* of the various companies is accomplished.

SEC, REPORT ON THE STUDY OF INVESTMENT TRUSTS AND INVESTMENT COMPANIES: ABUSES AND DEFICIENCIES IN THE ORGANIZATION AND OPERATION OF INVESTMENT TRUSTS AND INVESTMENT COMPANIES, H.R. Doc. 279, 76th Cong., 1st Sess. (1939–1940) at 1411 (emphasis added).

And in identifying the evils to be remedied, the report continued:

[T]hese voluntary plans of readjustment of the rights and values of the holders of shares of corporations, which may involve a change in the character of a stockholder's investment at least as drastic in nature as that accomplished by a judicial reorganization, are not subjected to the scrutiny of any unbiased authority. In judicial reorganizations, the fairness of the plan is a subject of judicial inquiry. * * *

Investment company officials advocated similar safeguards with respect to plans of merger, consolidation, sales of assets or exchange offers.

*Id.* at 1427–1428.

Subjecting proposed plans of merger to the scrutiny of independent review was found

---

**14.** Charles C. Townsend, Jr., a partner of Morgan Stanley & Co., and managing director of Morgan Stanley & Co., Inc., an affiliated corporation testified:

Q. They [the shareholders of Christiana] would sacrifice the principle of diversification because of the fact that they were holding du Pont shares underpriced; is that correct?
A. No, no. I haven't said they were underpriced. They sold for what they were, the assets and earnings and dividend and so on that Christiana had, and sold on that basis as a separate stock in the market.

Townsend's observations paralleled those of Mr. Justice Holmes in *Galveston, H. & S. A. R. Co. v. Texas,* 210 U.S. 217, 226, 28 S.Ct. 638, 639, 52 L.Ed. 1031 (1908):

[T]he commercial value of property consists in the expectation of income from it * *.

592

necessary because the presumption of the state statutes that " * * * the directors of the several corporations involved in negotiations for a merger * * * are acting at arm's length in an endeavor to secure the best possible bargain for their respective stockholders" was untrue in practice. *Id.* at 1414 (emphasis added). The Commission made other relevant comments:

> Where * * * several corporations are under common control * * * the possibility of a * * * merger * * * which is disadvantageous to minority stockholders becomes apparent. * * * Minority stockholders are without unbiased representatives to negotiate the terms of * * * merger agreements. In this situation the intent and spirit of the state merger * * * statutes may be substantially nullified.

*Id.* at 1414.

> [T]he remedy by appraisal is an inadequate one. The statutes do not require that stockholders be informed of their right of appraisal. * * * Even if stockholders are cognizant of their right to an appraisal, the procedure prescribed by the statutes for obtaining it is highly technical and costly. * * * "It is a remedy which does not prevent or set aside inequitable corporate readjustments. * * *."

*Id.* at 1422 (footnote omitted).

> [J]udicial proceedings * * * [are] expensive and usually beyond the means of the average investor * * *. And stockholders who actually sue, although they do so technically in behalf of themselves and all other stockholders, usually are interested in their own welfare only. As a consequence, the actions of suing

stockholders in many instances may be settled by managements who fear that a case for equitable relief is clear or probable.

*Id.* at 1423.

Thus, the Act requires prohibited transactions to be shown in advance of their execution to be reasonable and fair and not the product of overreaching by any person. *See Securities & Exch. Com'n v. Advance Growth Capital Corp.,* 470 F.2d 40, 42–43 (7th Cir. 1972). The thrust of the section, as evidenced by its legislative history, is that the Commission must require merger proposals to be within the range that arm's-length bargainers would agree to if they were negotiating the terms of the merger.

The Commission states that the absence of arm's-length bargaining "matters not." We disagree. We do, however, agree with the Commission that, because of the relationship of the parties, the Act places its primary concern on the fairness of the results of the negotiating process. But "fairness" is a relative term; and in judging transactions between dominant and subservient parties, the test is "whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." *Pepper v. Litton,* 308 U.S. 295, 306–307, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (footnote omitted).[15] It is only scrutiny of this character that will provide the protections under the Act intended by Congress and it is this that the Commission failed to do here.[16]

C. The Commission's prior decisions lend little support to its holding that Christiana should be valued exclusively on the basis of its net assets. No cases, either cited to us or found by our independent research, holds

15. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), was concerned specifically with the power of the bankruptcy court to disallow a judgment obtained by the dominant and controlling shareholder of a bankrupt corporation. But the proposition cited is one of general application to corporate law and equity. *See Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 522, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Southern Pacific Co. v. Bogert,* 250 U.S. 483, 487–488, 39 S.Ct. 533, 63 L.Ed. 1099 (1919). It characterizes the type of unbiased scrutiny found in judicial reorganizations which Congress intended to embody in the Act and to require of the Commission.

16. The Commission has the statutory power to go beyond the evidence presented by the applicants and compel additional testimony, if necessary, for the proper determination of the issue. *See* 15 U.S.C. § 80a–41.

that method of valuation proper as a matter of law. To the contrary, in those cases where the applicants or the Commission has stated that the respective net asset values of the merging corporations were the principal basis for the merger exchange ratio, other factors relevant to the issue of reasonableness and fairness were considered: *Townsend Corporation of America,* Investment Company Act Release No. 4045 (September 2, 1964) (earnings); *Harbor Plywood Corporation, et al.,* 40 S.E.C. 1002 (1962) (liquidation value, market price and dividends); *Century Investors, Inc., et al.,* 40 S.E.C. 319 (1960) (earnings and dividends); *New York Dock Company et al.,* 38 S.E.C. 754 (1958) (dividends and market value); *International Mining Corporation, et al.,* 37 S.E.C. 209 (1956) (market price); *Central States Electric Corporation,* 30 S.E.C. 680 (1949) (capital gains taxes on the unrealized appreciation of assets).[17]

Other cases cited to us and relied upon by Christiana and Du Pont for the stated rule of law are perfunctory approvals of applicants' proposals decided without contest or hearing. *See Huyler's,* Investment Company Act Release Nos. 5773, 5809 (August 13 and September 9, 1969); *Eastern States Corporation,* Investment Company Act Release Nos. 5693, 5711 (May 28 and June 16, 1969); *Southport Commercial Corporation,* Investment Company Act Release Nos. 4165, 4180 (February 17 and March 5, 1965); *Detroit and Cleveland Navigation Company,* Investment Company Release Nos. 3082, 3099 (July 27 and August 19, 1960). As such, they can be given little weight in determining whether the stated and relied upon rule of law is a valid one. *See Securities and Exchange Com'n v. Sterling Precision Corp.,* 393 F.2d 214, 220 (2nd Cir. 1968).

Applicants cite *Delaware Realty and Investment Company et al.,* 40 S.E.C. 469 (1961), as supportive of the Commission's decision. There, the Commission approved,

without hearing, the merger of Delaware Realty, also a closed-end, non-diversified investment company, into Christiana. In doing so, it gave the greatest weight to the net asset values of the merging corporations. It reasoned:

> In view of possible alternatives to a merger, under which the shareholders of Delaware and Christiana could realize the net asset value or underlying net asset value of their shares through an exchange for underlying assets or liquidation, greatest weight was given in the plan of merger to the relative net asset or underlying net asset values of the shares of the two companies. Since such alternatives to a merger would, however, impose tax liabilities upon shareholders and involve other problems, it was determined that a statutory merger would be in the best interests of shareholders. No adjustment was made to net asset values for capital gains taxes which would be payable upon a sale of assets, since the alternatives to merger would not result in taxes to the constituent companies, and the proportion of unrealized appreciation to net asset value is, in any event, substantially the same in the case of both companies.

*Id.* at 473.

This record does not show that other viable alternatives are available for Christiana to realize its net asset value. *See infra* at 598, 599.

Also cited are *Christiana Securities Company,* Investment Company Act Release No. 4876 (March 15, 1967) and *Christiana Securities Company,* Investment Company Act Release No. 4155 (January 28, 1965), where the Commission approved an exchange of Christiana common stock for the stock of Hercules Incorporated and General Motors Corporation, respectively. They are perfunctory approvals, granted without a

---

17. The Commission, pursuant to Chapter X of the Bankruptcy Act, issued an advisory report on the reorganization of Central States and considered net asset value. But that value was adjusted to reflect the capital gains taxes on the unrealized appreciation of the assets. The adjustment was necessary to determine the current worth of each shareholder's interest and the extent of their continued participation because the company was reorganized as an open-end investment company required to continually redeem its stock.

statement of reasons, and are, therefore, entitled to little weight.

In other cases, not cited to us by the applicants or the Commission, proposed merger terms based principally on the respective market values, with consideration also given to dividends, earnings and net asset value, have been found to be reasonable and fair.

*Electric Bond and Share Company,* Investment Company Act Release No. 5215 (December 28, 1967), was decided after public hearing in which protesters argued that the terms were unfair to both companies. The terms provided for the merger of American & Foreign Power Company, Inc., into Electric Bond and Share. We quote the Commission's conclusion:

> We have considered the various factors relevant to the fairness of the merger terms. Initially, we note that the shareholders of both companies will derive certain benefits from the amalgamation of the companies. * * *

> We have found that the market's evaluation of the stock of the two companies presents a guide to the value of the companies, and that on the basis of the market price relationship, * * * the proposed exchange ratio would provide Foreign Power's shareholders with a premium over the market price ratio. On the other hand, the initial post-merger dividend will represent a far greater dividend increase for the shareholders of Bond and Share than for the Foreign Power shareholders. Relative net asset values at face amount point toward a higher exchange ratio than that proposed; however, as we have found, Foreign Power's assets cannot be accepted at their face amount. We also note that on the basis of 1966 consolidated earnings, the exchange ratio would be favorable to Bond and Share's stockholders, but if consideration is given

to realized capital gains the exchange ratio would be favorable to Foreign Power's shareholders.

*Id.* at 20.

The Commission's approach to the issue of the reasonableness and fairness of the merger is strikingly different from that espoused here. Economic and not legal considerations were found dispositive. *See also Southeastern Capital Corporation,* Investment Company Act Release Nos. 4110, 4133 (December 23, 1964 and January 12, 1965) (merger based on the market and asset values of the respective companies approved by the Commission without hearing).

We further note that in *Tally Industries, Inc.,* Investment Company Act Release No. 5953 (January 9, 1970), the Commission declined to grant an exemption order under § 17(b)(1), finding the *pro forma* after merger earnings and dividends to be inadequate to one of the constituent companies. Again, factors other than net asset value were found determinative.

The Commission's method of valuing investment companies has not been consistent, perhaps reflecting the fact that each case turns upon its particular facts. *See generally* C. Bosland, VALUATION THEORIES AND DECISIONS OF THE SECURITIES AND EXCHANGE COMMISSION (1964). Thus, we are not here confronted with a consistent interpretation of the Act by the agency charged with its enforcement meriting deference by a reviewing court. *See U. S. v. National Assn. Securities Dealers, supra,* 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 at 504; *County of Marin v. United States,* 356 U.S. 412, 420, 78 S.Ct. 880, 2 L.Ed.2d 879 (1958). Moreover, we are unaware of any decision of the Commission that applied the stated rule of law which was subsequently approved by a reviewing court.[18]

---

18. In *Harriman et al. v. E. I. DuPont de Nemours and Company, etc.,* Civil Action No. 4721, —— F.Supp. —— (December 23, 1975), the United States District Court for the District of Delaware considered, *inter alia,* whether the proposed merger of Christiana into Du Pont

was violative of Rule 10b–5, 17 C.F.R. § 240. The District Court held that it was not. It indicated in dicta that it accepted the Commission's view that net asset value is the fundamental valuation criterion of registered investment companies. It did so without a detailed

It, thus, appears that the Commission's argument that valuation is a legal question is not only new to this case, but is unsupported by its own precedent or that of a reviewing court.

D. The practice under similar statutory standards developed in the judicial supervision of corporate reorganizations also militates against acceptance of the Commission's position.

█ In construing the "just and reasonable" standard under the Transportation Act of 1940, 49 U.S.C. § 1 *et seq.*, the Supreme Court said:

> [T]he merger terms, as to stockholders, must be found to be just and reasonable. These terms would be largely meaningless to the stockholders if their interests were ultimately to be settled by reference to provisions of corporate charters and of state laws. * * * Public regulation is not obliged and we cannot lightly assume it is intended to restore values, even if promised by charter terms, if they have already been lost through the operation of economic forces. * * * In appraising a stockholder's position in a merger as to justice and reasonableness, it is not the promise that a charter made to him but the current worth of that promise that governs, it is not what he once put into a constituent company but what value he is contributing to the merger that is to be made good.[19]

*Schwabacher v. United States,* 334 U.S. 182, 198–199, 68 S.Ct. 958, 967, 92 L.Ed. 1305 (1948) (citations omitted). *Accord, Securities and Exch. Com. v. Central-Ill. Sec. Corp.,* 338 U.S. 96, 129, 69 S.Ct. 1377, 93

L.Ed. 1836 (1949) (review under the "fair and equitable" standard of the Public Utility Holding Company Act, 15 U.S.C. § 79k(e)). We believe the inquiry under the Act must be similar. The desires of Christiana shareholders to realize the net asset value of their company, not protected by statute or contract, are not determinative. The reasonable and fair standard of the Act requires that economic and not legal doctrine guide the Commission's inquiry. *See Schwabacher v. United States, supra,* 334 U.S. at 200, 68 S.Ct. 958; *Moulded Products, Inc. v. Barry,* 474 F.2d 220, 225–226 (8th Cir.), *cert. denied, Stockholders Protective Committee for Moulded Products, Inc. v. Barry,* 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *Nanfito v. Tekseed Hybrid Co.,* 473 F.2d 537, 541 (8th Cir. 1973). The inquiry must be both independent and thorough, giving consideration to all factors affecting the value of what the Christiana shareholders are contributing to the merger.[20] *See TMT Trailer Ferry v. Anderson,* 390 U.S. 414, 442, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Securities and Exch. Com. v. Central-Ill. Sec. Corp., supra,* 338 U.S. at 144–145, 69 S.Ct. 1377; *Schwabacher v. United States, supra,* 334 U.S. at 201, 68 S.Ct. 958; *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 115, 60 S.Ct. 1, 84 L.Ed. 110 (1939).

The rule in tax law is also contrary to the Commission's view that the issue of proper valuation can be determined on legal, and not economic, principles.

> [T]he general principle of the Treasury Regulations is that the value of property

---

examination of the precedents cited by the Commission. We disagree with the dicta but express no opinion on the Rule 10b–5 issue.

**19.** The Court further said:

> In determining whether each class of stockholders received an equivalent of what it turns in, the Commission, of course, is under a duty to see that minority interests are protected, especially where there is an absence of arm's length bargaining or the terms of the merger have been imposed by management interests adverse to any class of stockholders.

*Schwabacher v. United States,* 334 U.S. 182, 201, 68 S.Ct. 958, 968, 92 L.Ed. 1305 (1948).

**20.** One scholar notes:

> Current investment value theory seems to have turned away from book or asset value and has placed almost exclusive emphasis upon future returns expected from a stock, whether they take the form of earnings, dividends, capital appreciation, or ultimate sale price or liquidation payment.

Banks, "A Selective Inquiry Into Judicial Stock Valuation," 6 Ind.L.Rev. 19, 38 (1972) (footnote omitted).

is to be determined by its fair market value at the time of the decedent's death. "The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas.Reg. § 20.2031–1(b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gift taxes themselves * * *.

United States v. Cartwright, 411 U.S. 546, 550–551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). See also Hamm v. C.I.R., 325 F.2d 934, 937 (8th Cir. 1963), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964); O'Malley v. Ames, 197 F.2d 256, 258 (8th Cir. 1952); Weber v. Rasquin, 101 F.2d 62, 64 (2nd Cir. 1939). Such a price necessarily accounts for all factors relevant to value.[21]

Paulina Du Pont Dean v. Commissioner, 19 TCM 281 (1960), and Mary A. B. Du Pont et al., Executors v. Commissioner of Internal Revenue, 38 B.T.A. 926 (1938), further illustrate this principle.

In Paulina Du Pont Dean, the issue presented was the value of four thousand (4,000) shares of Nemours Corporation for gift tax purposes. Nemours owned stock in Delaware Realty and Investment Company which owned stock in Christiana, Du Pont and Hercules Powder Co. Christiana owned stock in Du Pont, General Motors Corporation, Wilmington Trust Company and the News-Journal Company. The court valued Christiana at 79.42% of net asset value, Delaware Realty at eighty-six percent (86%) of its net asset value and Nemours at eighty percent (80%) of its net asset value, for a cumulative discount of fifty-four and six-tenths percent (54.6%) discount. The discounted value of Delaware Realty and Nemours reflected primarily the consideration given to their earnings, dividends and taxes. In valuing Christiana, the court stated:

> [W]e can discern no reason for using any figure as the value of Christiana * * * other than the market or the bid and asked prices * * *. The mean between the bid and asked prices of Christiana common reflects a 20.58% discount from the net asset value of that security and it is considered unrealistic to assume a liquidation by sale of the assets.

Id. at 287.

In Mary A. B. Du Pont, the issue was the value of Christiana and Delaware Realty common stock for estate tax purposes. Christiana was found to have a net asset value per share of $1,760.60 and Delaware Realty a net asset value per share of $15,043.66. But after considering other factors relevant to value, e. g., the taxes incurred should the companies sell their assets for diversification or some other purpose, the investor's primary reliance on dividend payout, and the lack of market for Christiana stock, the court found the value of the stock to be one thousand dollars ($1,000) per share and eight thousand five hundred dollars ($8,500) per share, respectively. In the case of Christiana, this represented a forty-three and two-tenths percent (43.2%) discount.

The Delaware law of statutory appraisal further exemplifies the error of the Commission's holding. In valuing the stock of a closed-end investment company, the Delaware Court of Chancery said:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has

---

**21.** [I]t may be said that the present tendency of the courts seems to be to give consideration to all elements, giving more or less weight to individual factors as the circumstances of the case may require, but without pinpointing any one as being finally determinative. It appears, however, that absent special circumstances, the courts will give first importance to earning power as a valuation factor.

Körner, "Issues and Problems in Valuing Closely Held Business Interests for Estate Tax Purposes, Especially Partnership Interests," N.Y. Univ. 30th Annual Inst. on Fed. Tax., 185, 193 (1972) (footnotes omitted).

been taken from him, viz., his proportionate interest in a going concern.

\*   \*   \*   \*   \*   \*

The important thing to bear in mind is that value of stock in a going concern is to be measured in terms of ability to realize that value through various media. *Tri-Continental Corporation v. Battye*, 31 Del.Ch. 523, 74 A.2d 71, 72, 76 (1950). Du Pont's counsel, commenting on this case, noted that "the decision quite clearly indicates that net asset value is not determinative of value in proceedings under the Delaware appraisal statute, market discount is of great, if not controlling, importance." We agree with the observation. The requirement of the Act that merger terms be reasonable and fair is, of course, not determined by the appraisal laws of the states. But, these laws are relevant in considering the worth of the Christiana shareholders' investment in their company.

■ To summarize, we hold that the Commission erred in deciding, as a matter of law, that Christiana should be valued on the basis of its net assets (primarily stock in Du Pont).[22] We reach this conclusion from the language of the Act, the legislative history of the Act, a study of the relevant decisions of the Commission, and an examination of related areas of the law.[23]

## III. THE RECORD AS A WHOLE DOES NOT SUPPORT THE COMMISSION'S GENERAL FINDING THAT THE TERMS OF THE MERGER ARE REASONABLE AND FAIR.

■ There remains the question whether the Commission's general finding of reasonableness and fairness can be sustained on the record as a whole.[24] The applicants urge that it can. They reason: (A) that because the merger proceedings were carefully structured to provide as nearly as possible for arm's-length bargaining, we should give substantial weight to the bargain reached; and (B) that when all factors are considered, the record supports the Commission's general finding that the terms of the merger are reasonable and fair.[25]

22. The Commission similarly erred in holding that the terms of the merger were reasonable and fair because *no detriment was incurred by Du Pont or its shareholders.* Lack of detriment is, like net asset value, just one factor to be considered in determining the reasonableness and fairness of a merger.

23. The United States District Court in *Harriman et al. v. E. I. DuPont de Nemours and Company, etc.,* Civil Action No. 4721, 411 F.Supp. 133 (D.Del., December 23, 1975), found the instant merger fair under Delaware law. It cited in support of its holding *David J. Greene & Co. v. Dunhill International, Inc.,* 249 A.2d 427 (Del.Ch.1968); *David J. Greene & Co. v. Schenley Industries, Inc.,* 281 A.2d 30 (Del. Ch.1971); *Meyerson v. El Paso Natural Gas Company,* 246 A.2d 789 (Del.Ch.1967); and *Getty Oil Company v. Skelly Oil Company,* 267 A.2d 883 (Del.1970). We note that the first case cited imposed a standard of intrinsic fairness in determining whether to approve a merger between a dominant and subservient corporation, but that the last three cases cited required a lesser showing of fraud or palpable overreaching as a condition to setting aside the corporate transactions involved. We acknowledge and give weight to the District Court's decision on Delaware law. We will not state whether we believe it was properly applied. We simply hold that the federal test of reasonableness and fairness has not been met here.

24. We might ignore the question on the theory that the Commission had not clearly focused on it because of *its erroneous views of the law.* We reject that alternative because: the applicants offered extensive oral and written testimony *with respect to the issue and do not* argue that the record is incomplete; the Commission discussed much of the evidence relating to the question; there have already been extensive delays in the administrative process; and the applicants urge the correctness of the general finding.

25. We review the Commission's decision in the light of Judge Harold Leventhal's statement in *Greater Boston Television Corporation v. FCC,* 143 U.S.App.D.C. 383, 444 F.2d 841, *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 2233, 29 L.Ed.2d 701 (1971):

A court does not depart from its proper function when it undertakes a study of the record, hopefully perceptive, even as to the evidence on technical and specialized matters, for this enables the court to penetrate to the underlying decisions of the agency, to satisfy itself that the agency has exercised a reasoned discretion, with reasons that do not deviate from or ignore the ascertainable legislative intent. "The deference owned to an expert tribunal cannot be allowed to slip into a judicial inertia." *Volkswagenwerk Ak-*

A. We cannot give substantial weight to the bargain reached. Du Pont did take some steps to simulate arm's-length bargaining. It named two directors, C. B. McCoy and Irving Shapiro, who were not shareholders of Christiana or members of the du Pont family to represent it in the negotiations.

McCoy and Shapiro, in turn, retained the First Boston Corporation, an investment banking firm, to advise them on the financial aspects of the merger. First Boston had no previous significant business relationships and no interlocking directors with either Christiana or Du Pont, and neither First Boston nor its officers or directors had any significant stock interest in either Christiana or Du Pont.

The Du Pont negotiators joined with the Christiana negotiators in retaining Morgan Stanley & Co., an investment banking firm, as financial adviser to both companies. Morgan Stanley had previously acted as financial adviser to both Christiana and Du Pont. It had no interlocking directors with either Christiana or Du Pont, and neither the firm nor its partners had any significant stock interest in Christiana or Du Pont.

The Christiana negotiators retained Kidder, Peabody & Co., Incorporated, an investment banking firm, to advise it separately on the financial aspects of the merger. Kidder, Peabody had no significant business relationship and no interlocking directorships with either Christiana or Du Pont, and neither the firm nor its officers or directors had any significant stock interest with either Christiana or Du Pont.

The steps taken with respect to the composition of the negotiating committee were inadequate.[26] McCoy and Shapiro were full-time employees of the corporation; they were selected for the negotiating committee by a Board of Directors presumptively controlled by Christiana; they had their compensation fixed by a six-man Bonus and Salary Committee, three of whom owned stock in Christiana;[27] and McCoy was a trustee of the Wilmington Trust Company which holds fifty-six percent (56%) of Christiana's stock in trust and votes sixteen percent (16%) of that stock without consultation with beneficiaries.

We do not suggest that it was improper for the Board of Directors of Du Pont to choose McCoy and Shapiro to serve on the negotiating committee. Their knowledge and expertise were undoubtedly important. We only suggest that the arm's-length nature of the bargaining would have been strengthened had the Du Pont negotiating committee also included highly competent representatives of the non-employee, non-du Pont family shareholders. It would have been further strengthened had the Christiana committee included at least one representative of its non-family shareholders.

We recognize that the recommendations of the negotiating committee were approved by unanimous vote of the Board of Directors of Du Pont, with those Du Pont directors holding Christiana stock not voting. The recusing, while proper, does not change our view with respect to the arm's-length nature of the transaction. All but two of the thirteen directors who voted on the proposed merger, Caryl P. Haskins and

---

*tiengesellschaft v. FMC*, 390 U.S. 261, 272, 88 S.Ct. 929, 935–936, 19 L.Ed.2d 1090 (1968). *Id.* at 850 (footnote omitted).

**26.** The presence of independent boards of directors and independent financial advisers is a relevant factor in determining whether proposed merger terms are reasonable and fair. *See LaSalle Street Capital Corporation*, Investment Company Act Release No. 6693 (August 23, 1971) at 7; *Tally Industries, Inc.*, Investment Company Act Release No. 5953 (January 9, 1970) at 10.

**27.** According to the preliminary proxy statement, the Bonus and Salary Committee of Du Pont as of the date of the statement included:

Emile F. du Pont;
Hugh R. Sharp, Jr.;
Robert L. Richards;
Robert L. Hershey;
George E. Holbrook;
Howard W. Johnson.

The first three were shareholders of Christiana.

Howard W. Johnson, were employees or retired employees of Du Pont. Moreover, it is clear from the record that the Board relied on the recommendations of the negotiating committee when it approved the transaction.

The appointment of financial advisers was also significant, but only limited weight can be given to their recommendations. First, the recommendations were premised in part on the errors of law discussed in Section II of this opinion.

Second, two of the advisers, Morgan Stanley and Kidder Peabody, were, according to the staff of the Division of Investment Management Regulations of the Commission, "influenced by the Applicants to such an extent that the objectivity of their final recommendations was substantially undermined."[28] Moreover, according to the same source, the advisers were influenced by each other.[29] The staff's comments are supported by the record as a whole.

Third, the alternatives to merger suggested by Morgan Stanley and Kidder Peabody, as justification for the terms reached here, were not established to be either feasible or realistic.

The applicants initially informed the advisers that a § 333 liquidation of Christiana was a feasible alternative to the proposed merger and that the maximum tax exposure to Christiana shareholders in such a liquidation would be between $40 and $70 million or, at the maximum, a tax liability to Christiana' nontax-exempt shareholders of approximately two and eight-tenths percent (2.8%). In the light of this information, the applicants' financial adviser, Morgan Stanley, told Du Pont that it would not be well advised to push for a discount greater than two percent (2%). Thereafter, Morgan Stanley was advised that a § 333 liquidation was not a feasible alternative because Christiana's tax liability could not be computed with any degree of certainty.[30] Notwithstanding this change of circumstances, Morgan Stanley made only a minor adjustment downward of five-tenths of a percent (0.5%) in the discount recommended. An equally minor adjustment was made by Kidder Peabody when it became aware of the same fact. No adjustment was made by First Boston. But this fact is unimportant, for there is no showing that First Boston gave weight to the availability

**28.** The Division stated:

In our view, true independence of financial advisers where fairness is at issue would preclude a situation where the advisers are made aware of their clients' thinking as to proper terms and consciously or not, are likely to tailor their opinions, to some degree, to the results desired. Although it is clear from the Record that all the advisers did considerable and highly competent work, how much more credible their final products would have been had they been permitted to hand them over to their clients without the pressures resulting from the knowledge that the negotiators were striving for a 2.5% discount. Obviously, if that had been the case, the recommended ranges could have been sufficiently disparate to require a re-thinking of the merger terms. But, unfortunately, the negotiators sought unanimity so excessively that they diminished substantially the value of the advisers' opinions through the imposition of their own views upon the advisers.

**29.** The Commission skirted the objectivity issue by holding that as the issues presented were essentially legal in nature, they could not be resolved by reference to the opinion of financial experts.

**30.** Tax counsel advised Christiana that "if all the legal questions discussed were resolved against Christiana, the result would be an earnings and profit figure vastly in excess of $85.8 million." It recommended that a § 333 liquidation was not a viable alternative to merger. Mr. L. E. Grimes, Assistant Treasurer of Du Pont, testified that he envisioned a tax as high as $200 to $400 million. A tax liability of that magnitude, via liquidation, would be equivalent to an eight and five-tenths percent (8.5%) to seventeen and two-tenths percent (17.2%) discount from net asset value via merger. It is difficult to understand the Commission's failure to insist that the applicants present more detailed information on the potential tax liability, or have its staff develop the required data. The failure can only be understood as reflecting its legal ruling that protection of the Christiana shareholder's net asset value is the determinative factor in finding the merger reasonable and fair. Under these facts, the Commission's statement that "a liquidation might be much more expensive for Christiana's stockholders than this tax-free plan" can be accorded no weight. *Christiana Securities Company, supra* at 10. It is at best a gross understatement.

of the alternatives in the first instance. It based its recommendations throughout on the lack of detriment to Du Pont and its shareholders, and its belief that it was not improper for Du Pont to accommodate the Christiana shareholders by an exchange of stock based on the net asset value of Christiana.

Kidder Peabody suggested that Christiana could improve the market price of its stock by increasing the demand therefor. The suggestion required the initiation of a plan whereby electing Christiana shareholders would direct their dividends be paid to a trustee authorized to use the proceeds to purchase Christiana common stock. The trustee would buy in the open market or from the company at net asset value, whichever was lower, and remit the stock to the electing shareholders. Kidder Peabody opined that if shareholders, representing fifty percent (50%) of the stockownership of Christiana, were to accept the plan, the average daily volume of sales of Christiana stock would be doubled and the market discount significantly reduced, if not eliminated, over a period of time. It stated that the technique had been successfully used by the Madison Fund and the Paul Revere Fund. The Commission did not receive testimony in support of the statement, nor did it make an independent analysis of the proposition. Available statistics suggest that the validity of the theory has yet to be demonstrated.[31]

Kidder Peabody suggested that another available alternative was for Christiana to solicit a merger partner in the form of an operating company or another investment company. It conceded that the business, financial and legal difficulties were "admittedly large and the time horizon extended" but stated that the alternative must be given some weight. Morgan Stanley, on the other hand, stated such a merger was unlikely because of the size of the Christiana block and the effect of the United States antitrust laws. On the basis of this record, it has not been shown that merger with another operating company or another investment company is in fact a feasible alternative. The antitrust complications are serious and the size of the block of Christiana severely limits the potential merger partners. At April 28, 1972, market prices, a minimum investment of $860 million would be required to secure control of Christiana.

The applicants belatedly recognized in their application for approval of the merger

---

31. The accuracy of Kidder Peabody's statement that the technique would be successful is questionable. As reported in Weisenberger Services, Inc., *Investment Companies* (1975) at 52, the year-end discounts for the Madison Fund and the Paul Revere Fund were:

| | Madison Fund | Paul Revere Fund |
|---|---|---|
| 1971 | 3% | 5% |
| 1972 | 19% | 9% |
| 1973 | 34% | 39% |
| 1974 | 29% | 26% |

*See* Appendix I.

The common stocks of closed-end investment companies have traditionally sold at both premiums and discounts from net asset value. The average premium or discount on a sample of closed-end, diversified investment company stocks has varied from a high of about an eight percent (8%) premium in 1970 to a low of about a twenty-two percent (22%) discount in 1974.

that the only feasible method for Christiana to achieve its objectives of eliminating the intercorporate dividend tax and the potential capital gains tax on the unrealized appreciation of its assets was through a tax-free merger.[32] Unfortunately, by then, the financial advisers' recommendations had already been acted upon.

Fourth, First Boston viewed the transaction simply as an accommodation to existing Christiana shareholders without disadvantage to Du Pont or its shareholders. This view was a candid one and may reflect the most important reason for the Du Pont negotiators agreeing to the terms that they did. The difficulty is that First Boston fails to explain why Du Pont should accommodate Christiana shareholders by paying $491 million more for their stock than it was worth on the open market.

Fifth, the Du Pont negotiating committee initially told the financial advisers that it was receptive to a merger because such action would tend to simplify corporate operations, particularly with respect to actions necessary to comply with the Act, and would broaden the shareholder base. The record indicates that neither factor was a significant one in Du Pont's decision. To the contrary, at hearing, Du Pont's negotiators flatly stated that their objection was to eliminate the Christiana block of stock as a control factor.

We think it demonstrated from the above that the financial advisers acted without a clear understanding of the legal principles involved and that they were neither as independent nor as thorough as they should have been. It follows that the Du Pont Board's unanimous approval of the merger based in part on the financial advisers' report cannot be given substantial weight.

B. The record does not support the Commission's general finding that the terms of the merger are reasonable and fair. The economic benefits to Christiana shareholders from the merger are immediate and substantial. They will receive a premium of twenty-eight and five-tenths percent (28.5%) for their stock ($491,208,370 on the basis of the April 28, 1972, market price for Christiana); they will share in the undistributed earnings of Du Pont; they will, assuming a payout ratio roughly equivalent to the three lowest of the last five years, receive an increase in dividends of forty-

*Id.* at 22.

**32.** The application states:

From time to time, Christiana has considered various means by which Christiana stockholders could be relieved of the foregoing disadvantages. In view of Federal tax considerations discussed below, the only feasible method available to Christiana to achieve this objective is a tax-free merger into Du Pont. Accordingly, Christiana proposed to DuPont that such a merger be considered.

two cents ($0.42) per share (from $5.25 to $5.67); and they will receive a more marketable stock.

The economic benefits to present Du Pont shareholders are minimal. The market value of their shares will be increased by slightly less than four-tenths of one percent (0.4%) ($23 million) as a result of the retirement of approximately 189,000 shares of Du Pont; they will benefit by increased earnings of five cents ($0.05) per share (from $7.31 to $7.36); and they will, assuming a payout ratio as set forth above, receive an increase in dividends of four cents ($0.04) per share ($5.01 to $5.05).

Du Pont negotiators argue that notwithstanding the fact that Christiana shareholders will get the lion's share of the economic benefits, the merger is nevertheless beneficial for Du Pont and its shareholders. Various reasons, most of which have already been discussed, were advanced for this position at different stages of the proceedings. At the hearing before the Commission, the important benefit to Du Pont was said to be the dispersal of the block of twenty-eight percent (28%) of Du Pont stock held by Christiana. Mr. Irving Shapiro was emphatic in making this point. He stated:

> [T]he central consideration from the du Pont standpoint * * * is the dispersal of a block of 28 percent of du Pont stock in the hands of Christiana. And I say that with a fair amount of diffidence, because, as a matter of history, Christiana has contributed greatly to the success of the du Pont Company over the years. Men such as Pierre S. du Pont, Lamont du Pont, Irenee du Pont, Walter S. Carpenter, Jr., Lamont du Pont Copeland, Crawford H. Greenewalt have all been giants in building the du Pont Company, and they have also been connected with Christiana. * * *

> When you look to the future, however, it seems to me we have a totally different picture. And I think this must have underlain the consideration of the Christiana board when Mr. du Pont's letter [suggesting merger] was written.

> As these men, some of whom are now gone and others who are now in the latter years of their lives, looked to the future, it strikes me that they must have asked themselves who is going to be managing Christiana in the years to come and what skills do they bring to understanding the chemical industry and the du Pont Company. And having examined it that way, I suspect they must have concluded it is unwise to deal with uncertainty for the future. But whatever their thinking may have been, from my standpoint the critical consideration for the future of the Du Pont Company—and I am talking about those who follow us in management, rather than the current management—is that there not be a block of 28 percent of du Pont shares in hands of people who have no familiarity with the chemical business and with the du Pont Company in its detailed operations.

> And it is the elimination of that kind of an uncertainty for the future which seems to me so overbearing in importance that the merger is the greatest news that I can think of for the du Pont Company.

The Commission viewed the dispersal of control as being more formal than substantive [33] and gave little weight to this factor.

---

**33.** The Commission stated:

> The "dispersal" argument is somewhat puzzling. Applicants insist over and over again that it is most unlikely that any substantial number of Du Pont shares will come to market by reason of the proposed transaction. In that regard applicants point quite cogently to the large individual capital gains taxes that selling Christiana holders will have to pay and to the long-run character of the du Pont family's investment commitment to the company that bears its name. What then is likely to be dispersed?

> It would seem that the dispersal will be formal, not substantive. Today some people own a great deal of Du Pont indirectly through Christiana. Tomorrow those very same people will still own a great deal of Du Pont. But they will own it directly rather than indirectly. What will that change do for Du Pont?

> Du Pont's answers to these questions look to the long run. Its brief concedes that its

Its theory was that it could not be concerned with whether Du Pont was controlled by Christiana, the du Pont family, successors to the du Pont family or current management.

We agree with the Commission that the dispersal of control appears to be more formal than substantive. The Wilmington Trust Company would continue to exercise some degree of control over fifty-six percent (56%) of the newly-issued Du Pont stock. The du Pont family would continue to hold more than twenty-two percent (22%) of the Du Pont stock. The Finance Committee [34] and the Bonus and Salary Committee would continue to be controlled by the du Pont family. And the family would retain substantial membership on the Board of Directors.

We do not agree with the Commission that dispersal of control is irrelevant in a determination of reasonableness and fairness. Important advantages to Du Pont

and the public would flow from an effective dispersion of control. The problem is that the degree of dispersion attained here does not justify the substantial premium paid for the Christiana stock.

Christiana argues that the merger should nonetheless be approved because the economic benefits which its shareholders would receive are largely the result of the operation of the tax laws of the United States, and that they alone are entitled to receive these benefits.[35] We take a different view of the matter. As we see it, Christiana would have us ignore the market value of its stock in determining reasonableness and fairness. We cannot do so. Market value, like net asset value, is a factor which must be considered in determining the worth of an investment. The fact that the market value of Christiana stock is affected by the intercorporate dividend tax and unrealized capital gains liabilities is no reason to ignore that value in determining its worth.[36]

"management was aware of no immediate prospect of any adverse consequences from the Christiana holdings." The brief goes on to argue, however, "that over the long term such a possibility might arise."

The precise nature of these possible long-term adverse consequences is obscure. The argument rests on the possibility of a future clash between the people then in control of Christiana and the people then managing Du Pont. It assumes that in this hypothetical situation the Du Pont managers will be the "good guys" and the Christiana control group the "bad guys." The argument seems far-fetched and rests on premises we consider unacceptable. Christiana's extinction may well make it somewhat easier for Du Pont's managers to maintain themselves in office. We, however, cannot presume that this will necessarily be in the Du Pont stockholders' interest. And in any event the Investment Company Act was not designed to foster the retention of control by managerial groups. Nothing in it warrants a holding that such control is to be preferred to control by important stockholders. (Footnotes omitted.)

*Christiana Securities Company, supra* at 14–15.

**34.** As of the date of the hearing, the Finance Committee consisted of:

Crawford H. Greenewalt (a du Pont family member);
George P. Edmonds (a du Pont family member);
E. F. du Pont (a du Pont family member);

W. S. Carpenter (a du Pont family member);
Edward R. Kane (a Du Pont employee);
George E. Holbrook (a Du Pont employee; and
Charles B. McCoy (a Du Pont employee).

**35.** The Commission stated:

It might seem that the discount should at the very least equal the 7.2% income tax benefit to be realized by the Christiana stockholders. * * * This consideration, however, we put to one side. The heart of the matter is that the tax benefits to be reaped by the Christiana people will inflict no corresponding detriment on Du Pont or on its stockholders. The burden will fall wholly on the United States. *And neither the du Pont family nor the other Christiana holders are under any duty to maximize their tax liabilities.*

*Christiana Securities Company, supra* at 17 n. 44.

We agree that the members of the du Pont family are under no duty to maximize their tax liabilities. Correspondingly, Du Pont is under no duty to the family to assist them in minimizing those liabilities. *Fairness requires that Du Pont share in the tax savings that result from its cooperation.*

**36.** The market value of the stock of most closed-end investment funds is affected by the same factors. *See* B. Malkiel, *A Random Walk Down Wall Street* (1973) (relatively low average returns on assets, unrealized capital gains in fund portfolios, and lack of sales efforts

We might have a different case if Christiana stock had not consistently sold at a substantial discount from net asset value. The fact is, however, that the discount has not been less than nine and seven-tenths percent (9.7%) and has been as high as thirty and three-tenths percent (30.3%) since April, 1967. The discount has not fallen below seventeen and seven-tenths percent (17.7%) since January 1, 1969.

There perhaps were times in the history of Christiana, particularly before World War II, when the du Pont family could have realized the net asset value of their shares by alternatives other than merger, but they chose to retain the economic, political and social advantages that accompanies control of one of America's largest industrial concerns. Having chosen to do so, they cannot now be heard to complain that the tax laws of the United States have affected the market value of their stock.

The protesters contend that the consummation of the merger will have a significant adverse market impact on the price of Du Pont stock. The applicants retort that any adverse impact will be minimal and of short duration. They reason that potential capital gains tax liabilities will discourage Christiana shareholders from selling their Du Pont stock, and that the Du Pont market is strong enough to absorb any sales

that will be made.[37] The Commission takes still another view:

> We assume that the merger may engender some selling that would otherwise not take place. We assume further that such selling may at certain points in time be substantial. Proceeding on those assumptions, we are nevertheless after considerable thought unable to detect any uncompensated detriment to the Du Pont stockholders of a type that we can properly take into account.

The stock market has its peculiarities. In essentials, however, it is much like other more basic markets in goods, services, and the factors of production. Here as elsewhere increased supply will (all other factors being equal—which in practice they may or may not be) lower prices. Should the Wilmington Trust Company decide to sell a substantial amount of Du Pont common, the price of the issue will be affected to some extent.

We agree with the objectors about that. But we disagree with their contention that this short-run view of the pricing process is the one that governs here. What we have before us in these proceedings is a proposal for a fundamental corporate readjustment. In that context transitory market phenomena are of secondary significance. We look at the case

commonly result in discounts from net asset value in closed-end investment funds); K. Boudreaux, *Discounts and Premiums on Closed-End Mutual Funds: A Study in Valuation,* 28 Journal of Finance (May 1973) at 515–522 (discounts and premiums are related to market expectations of the future performance of the fund). The relevance of Boudreaux's conclusion is that this record shows that holders of Christiana stock had no reasonable expectations of greater earnings, or higher prices for their stock unless this merger could be accomplished.

**37.** The federal income tax basis to present holders of Christiana common stock is summarized below:

| Basis | Number of Shares[a] | Percent of Total[a] | Percent of Subtotal |
|---|---|---|---|
| $ 0 | 2.9 mm | 25.1 | 35.7 |
| $ 0.01–25.00 | 3.1 | 26.6 | 37.8 |
| $25.01–50.00 | 0.7 | 6.4 | 9.1 |
| $50.01–100.00 | 0.8 | 7.3 | 10.3 |
| $100.01–150.00 | 0.2 | 2.0 | 2.8 |
| Over $150.00 | 0.4 | 3.0 | 4.3 |
| | 8.2 | 70.3 | 100.0 |
| Held by tax-exempt organizations | 1.3 | 11.0 | |
| No information available | 2.2 | 18.7 | |
| Total shares outstanding | 11.7 | 100.0 | |

a. Items do not add to totals because of rounding.

The disinclination on the part of the Christiana shareholders to sell their Du Pont stock will be heightened to the extent they are subject to the minimum tax on tax preference income.

not from the objectors' tape-watcher perspective, but as a problem in economic realities and business fundamentals. (Footnotes omitted.)

*Christiana Securities Company, supra* at 19–20.

The record supports the view that the merger will engender some selling that would not otherwise take place. The Wilmington Trust Company indicated that it would make sales from time to time, increased marketability generally will result in some additional shares of Du Pont finding their way into the market, and some block selling must be anticipated. It is the latter sales that may adversely affect the price of Du Pont stock for short periods of time.[38] The Commission would entirely ignore these short-term effects on the grounds that it is not interested in protecting "tape watchers." But persons other than "tape watchers" will be required to sell stock from time to time, and some of them may have to sell their Du Pont stock during a period in which the price of that stock is depressed. Moreover, "tape watchers" deserve the same protection as other investors. It follows that the Commission

erred in failing to give any weight to the factor of occasional detriment to Du Pont shareholders.[39]

To summarize: substantial weight cannot be given to the recommendations of the negotiating committee or the financial advisers; the economic benefits of the merger flow almost entirely to the Christiana shareholders and there are no significant compensating benefits that flow to Du Pont and its shareholders; and the potential detriment to Du Pont shareholders which would result from the merger is minimal but of sufficient import that the Commission should have accorded it some weight in determining reasonableness and fairness.

## CONCLUSION

We hold that there is not substantial evidence on the basis of this record to support the Commission's finding that the terms of the merger are reasonable and fair and free from overreaching on the part of anyone concerned. The order of the Commission granting the application to merge is accordingly set aside. Costs will be taxed equally to Du Pont and Christiana.[40]

38. In the first six months of 1972, the median daily volume of Du Pont shares sold was twelve thousand (12,000). Almost one-half of all the daily volumes were between ten thousand (10,000) and twenty thousand (20,000) shares. On three occasions, however, volumes in excess of one hundred thousand (100,000) shares were sold. It thus appears that the market has shown the capacity to occasionally handle large volumes of shares and appears flexible between ten thousand (10,000) and twenty thousand (20,000) shares. The merger agreement, however, provides that once a year an underwritten offering of $25 million in the then current market value of such shares can be made. At the average price of $165.00 in the first six months of 1972, this would approximate 153,000 shares.

39. The record supports the applicants' contention that the stock of Du Pont will not be significantly depressed for long periods of time. The market for Du Pont is sufficiently broad and strong to absorb not only the large offerings of restricted stock that may be made from time to time, but also to absorb increased daily

sales of stock that will flow from the improved marketability of the converted Christiana shares. *See Institutional Investor Study Report of the Securities and Exchange Commission, "Characteristics and Price Impacts of Block Trading in Common Stock listed on New York Stock Exchange,"* H.R.Doc.92–64, 92nd Cong., 1st Sess. (1971) at 1537–1828.

40. The Administrative Office of the United States Courts authorized the appointment of Professor Roger B. Upson, Associate Dean of the University of Minnesota College of Business Administration, to serve as a contract consultant in the office of the Circuit Executive. His duties as a contract consultant were to assist the Court in understanding the record in this case and to prepare reports and memoranda for this Court in connection with that function. Dean Upson's report was filed with the Clerk of this Court and copies thereof were submitted to the parties. The parties have been given an opportunity to respond. Dean Upson's consulting fees were paid by the Administrative Office.

STEPHENSON, Circuit Judge (dissenting).

I respectfully dissent.

I would affirm the action of the Securities and Exchange Commission in exempting the proposed merger from the proscription of 15 U.S.C. § 80a–17 et seq.[1] I am satisfied that "the Commission's action is based upon substantial evidence and is consistent with the authority granted by Congress." *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 207, 67 S.Ct. 1575, 1582, 91 L.Ed. 1995 (1946). *See* 15 U.S.C. § 80a–42(a).

The Commission is granted the broad authority to issue an order of exemption if the evidence establishes that:

> (1) the terms of the proposed transaction, including the consideration to be paid or received, are reasonable and fair and do not involve overreaching on the part of any person concerned;

15 U.S.C. § 80a–17(b)(1).

The Commission recognized that in applying this test "we must find this transaction fair to the stockholders of both companies. See *Bowser, Inc.*, 43 S.E.C. 277 (1967)." (Comm.Op. at 8 n. 22).[2] It took note of the contention of the two companies, Du Pont and Christiana, that in economic reality Christiana stock already is Du Pont stock under another name—98% of Christiana's total assets is Du Pont common stock. Thus the merger involves for all practical purposes an exchange of equivalents. On the other hand the three objecting Du Pont stockholders contended that the transaction would confer great benefits on Christiana's stockholders; give Du Pont stockholders nothing worth mentioning but actually injure them; and serve no real business purpose for Du Pont. The Commission then proceeded to analyze these contentions.

The benefits to Christiana stockholders[3] will be substantial. They stem from the federal tax structure and stock market phenomena. Under current tax law Christiana pays an effective 7.2% tax on the dividend income accrued on its Du Pont stock before such dividend is disbursed to Christiana stockholders. The merger eliminates this tax burden. An alternative method of accomplishing the same end could be achieved by liquidation of Christiana but it is conceded that tax consequences would make it more expensive than the merger which is a tax-free plan.[4]

The Commission noted that the tax benefits accruing to the Christiana stockholders

> will inflict no corresponding detriment on Du Pont or on its stockholders. The burden will fall wholly on the United States. * * * Nor do we see how Section 17(b)'s "reasonable and fair" standard can be deemed to require Christian's stockholders to turn every nickel of their tax savings over to Du Pont. The tax savings are of some weight. But it does not follow that the Du Pont stockholders are to be subrogated to the rights that the United States now enjoys under the status quo.

(Comm.Op. at 17–18, n. 44).

Taxpayers, of course, are not prohibited from arranging their affairs so as to minimize taxes. In *Commissioner v. First Security Bank*, 405 U.S. 394, 398–99 n. 4, 92 S.Ct. 1085, 1089, 31 L.Ed.2d 318 (1972), the Supreme Court observed that

> Taxpayers are, of course, generally free to structure their business affairs as they

---

**1.** Section 17(a) of the Investment Company Act of 1940.

**2.** The findings and opinion of the Commission reported as *Christiana Securities Company*, Investment Company Act of 1940, Release No. 8615 (December 13, 1974) will be referred to as (Comm.Op.). To avoid repeating matters set out in the majority opinion of this court citation thereto will be as follows: (Majority Op.).

**3.** Members of the Du Pont family hold about 75% of Christiana, the other 25% belonging to public stockholders.

**4.** The merger is designed to be tax-free to Christiana and its stockholders and was conditioned on a ruling to that effect by the Internal Revenue Service. A favorable ruling has now been made. IRS Opinion Letter to Kenneth W. Gemmill, counsel for Christiana Securities Co., December 30, 1975.

consider to be in their best interests, including lawful structuring (which may include holding companies) to minimize taxes. Perhaps the classic statement of this principle is Judge Learned Hand's comment in his dissenting opinion in *Commissioner v. Newman*, 159 F.2d 848, 850–851 (CA2 1947):

"Over and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions. To demand more in the name of morals is mere cant."

See *Knetsch v. United States*, 364 U.S. 361, 365, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); Chirelstein, Learned Hand's Contribution to the Law of Tax Avoidance, 77 Yale L.J. 440 (1968).

The stock market phenomenon is that Christian's shares were selling at a discount of 23% when the merger negotiations were first announced and during the preceding two years the discount had been between 20% and 25%.[5] The objectors and my colleagues insist that the fact that the market value of Christiana stock is affected by the intercorporate dividend tax and unrealized capital gains liabilities is no reason to ignore that value in determining its worth.

The Commission recognized that the benefits to the parties were not equal—the benefits inuring to the Christiana stockholders were greater than to the Du Pont stockholders.[6] Christiana's stockholders could have caused Christiana to be liquidated and thereby achieved the results contemplated by the merger. Admittedly, the merger was designed to avoid serious tax problems that Christiana's liquidation would engender for its stockholders. However, the Commission concluded that these tax-related benefits should not be weighed against Christiana in determining the overall fairness of the merger.

Aside from those tax problems, however, the economic impact of this merger on Du Pont and its stockholders is no more onerous than the impact that would be produced were the Christiana stockholders to exercise their prerogative to liquidate Christiana. More specifically, the possible market effects resulting from the Christiana stockholders acquiring direct ownership of the Du Pont shares would be the same. It may be that in the course of bargaining between wholly unrelated parties, Du Pont could have exacted a handsome price for permitting consummation of the transaction in a form that relieves the Christiana stockholders of their tax problems. But Du Pont's failure to do that does not render the transaction unreasonable or unfair. The Du Pont stockholders, including the objectors, have no property interest in the Christiana stockholders' tax problems. A principal reason why Section 17 of the Investment Company Act requires us to pass upon the fairness of transactions such as this, is to prevent persons in a strategic position from using that position to effect transactions for other than fair value. And fair value does not change simply because a strategic posi-

---

5. The discount is probably attributable to the intercorporate dividend tax of 7.2% and the fact that Christiana stock is a thinly traded over-the-counter issue whereas Du Pont is an active, well-known listed stock. (Comm.Op. at 22 n. 51).

6. The principal benefits accruing to Du Pont stockholders arise from the merger agreement which provides for the issuance of Du Pont common stock equivalent in value to 97.5% of Christiana's net assets after certain adjustments. The 2.5% discount from Christiana's net asset value amounts to approximately $55 million. It should be noted, however, that since Christiana has a 28.3% interest in Du Pont, 28.3% of the 2.5% discount will go back to Christiana stockholders. Another benefit is the dispersal of control. The Commission accorded this little weight because it viewed the same as being more formal than substantive (Majority Op. at 602, 603). I agree with the majority that important advantages to Du Pont and the public would flow from an effective dispersion of control (Majority Op. at 603).

tion arises from something other than affiliation.

(Comm.Op. at 18).

Instead, the Commission viewed the objectors' claim of detriment by reason of market impact to be the crux of the case. Objectors fear that the merger will produce considerable selling of Du Pont that otherwise would not take place and thus the market price would be depressed. Christiana argues there is little reason to believe that the Christiana stockholder will sell the Du Pont shares he receives in the merger because of adverse tax consequences. The tax basis of the Du Pont common stock received by the Christiana common stockholders who own only Christiana common stock will be the same as the basis of the Christiana common stock surrendered in exchange therefor. My colleagues are of the opinion that "the Commission erred in failing to give any weight to the factor of occasional detriment to Du Pont shareholders." (Majority Op. at 605). I am persuaded that the thrust of the Commission's view is that "[s]peculations about the probable behavior patterns of speculators are much too slender a reed on which to predicate findings of fairness under the Investment Company Act." (Comm.Op. at 22). This disagreement brings into focus the dispute with respect to the valuation standard applied by the Commission in assessing the fairness of the transaction. [7]

It is the Commission's view that:

Here justice requires no ventures into the unknown and unknowable. An invest-

ment company, whose assets consist entirely or almost entirely of securities the prices of which are determined in active and continuous markets, can normally be presumed to be worth its net asset value. What better guide to its value could there be? The simple, readily usable tool of net asset value does the job much better than an accurate gauge of market impact (were there one) could. The record indicates that most of Christiana's stock is held by long-term investors. Hence there is no pressing need to depart from the net asset value test.[57]

[57] Investment companies are as a general rule media for long-term investment. That makes net asset value the touchstone. And the Act is based on that premise. Section 2(a)(41)(B) states that " 'Value' with respect to assets of registered investment companies . . . means . . . with respect to securities for which market quotations are readily available, the market value of such securities." And although the closed-end discount phenomenon was well-known in 1940, the Congress that passed the Act chose to protect closed-end stockholders against dilution of intrinsic values rather than to facilitate the sale of new closed-end shares. Section 23(b) of the Act shows that. It provides that "No registered closed-end company shall sell any common stock of which it is the issuer at a price below the current net asset value of such stock." And we have viewed net asset value as the controlling factor in Section 17 proceedings. See, e. g., *Harbor Plywood Corporation*, 40 S.E.C. 1002, 1010 (1962); *Delaware Realty and Investment Company*, 40 S.E.C. 469, 473 (1961). Compare *Central States Electric Corporation*, 30 S.E.C. 680, 700 (1949) (advisory report on plans for the reorganization of a closed-end investment company under Chapter X of the Bankruptcy Act

**7.** Two other items deserve brief comment. The majority is of the view that substantial weight cannot be given to the bargain reached because of the absence of arm's length bargaining (Majority Op. at 598); further that only limited weight can be given the recommendations of the financial advisors (Majority Op. at 598). I do not disagree. Neither does the Commission. The Commission recognized that "[i]t is precisely because transactions of this character are replete with inherent conflicts of interest that the Act requires that they be submitted to us." (Comm.Op. at 26 n. 62).

The Commission noted that in some situations the opinions of experts were crucial, e. g.,

a question about the value of a major league baseball franchise, but such is not the case here. It commented:

The instant case, on the other hand, involves marketable securities. The questions presented are in our view essentially legal. Hence they cannot be resolved by reference to the opinions of financial experts, however conscientious and however eminent. We do not go so far as to say that expert testimony is of no weight here. Some of it we have found interesting and even instructive. But in view of the nature of the issues raised, we think its weight limited.

(Comm.Op. at 13–14 n. 38).

urging "net asset value as the primary measure of value of an investment company.") (Comm.Op. at 23–24 & n. 57).

My colleagues insist that the plain language of the Act does not permit the Commission to establish as a rule of law that closed-end, nondiversified companies should be presumptively worth the value of their net assets. (Majority Op. at 589, et seq.). I disagree. The Commission in this 17(b) proceeding has been delegated the responsibility of applying the "reasonable and fair" test. Its judgment in applying this broad criterion is not subject to reversal "save where it has plainly abused its discretion." *Securities & Exchange Commission v. Chenery Corp., supra*, 332 U.S. at 208, 67 S.Ct. at 1583; *accord, Niagara Hudson Power Corp. v. Leventritt*, 340 U.S. 336, 347, 71 S.Ct. 341, 95 L.Ed. 319 (1951); *Securities and Exchange Commission v. Central-Illinois Securities Corp.*, 338 U.S. 96, 126, 69 S.Ct. 1377, 93 L.Ed. 1836 (1949).[8] The above cases involve application by the Commission of the "fair and equitable" standard of section 11(e) of the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79k(e). In *Chenery, supra*, 332 U.S. at 209, 67 S.Ct. at 1583, the Supreme Court spoke as follows:

> The Commission's conclusion here rests squarely in that area where administrative judgments are entitled to the greatest amount of weight by appellate courts. It is the product of administrative experience, appreciation of the complexities of the problem, realization of the statutory policies, and responsible treatment of the uncontested facts. It is the type of judgment which administrative agencies are best equipped to make and which justifies the use of the administrative process. See *Republic Aviation Corporation v. National Labor Relations Board*, 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372,

157 A.L.R. 1081. Whether we agree or disagree with the result reached, it is an allowable judgment which we cannot disturb.

I am persuaded that this language controls our action in this case.

In summary, the proposed merger involves essentially an exchange of equivalents—Du Pont stock for Du Pont stock. The benefits to Christiana stockholders are substantially greater than to Du Pont stockholders. This is due largely to tax consequences. It will be a tax-free exchange. Christiana shareholders avoid the probable tax consequences a liquidation would involve. They also rid themselves of the intercorporate dividend tax of 7.2% which has contributed to the discount in the market value of Christiana shares as compared to Du Pont shares.[9] However, Du Pont shareholders have no property interest in these resultant tax savings. Further, the detriment to present Du Pont common stockholders is dubious. At the most there may be some additional selling of Du Pont stock which will temporarily affect the market value of Du Pont. This is highly speculative. The tax basis of Du Pont stock received by Christiana shareholders in the merger will be the same as the Christiana stock surrendered in exchange therefor. Tax consequences will deter the temptation to sell. Under all the circumstances the Commission concluded that the disparity in benefits justified the proposed 2.5% discount ($55 million) from the net asset value of Christiana. It was within the range of fairness. A discount appreciably higher "would divest Christiana stockholders of a significant portion of the intrinsic investment values to which they are legally and equitably entitled" and thus "run afoul of the Act." (Comm.Op. at 26).

---

**8.** The Congress in numerous statutes has established the Securities and Exchange Commission as the expert government agency in securities matters. Securities Act of 1933, 15 U.S.C. §§ 77a–77aa; Securities Exchange Act of 1934, 15 U.S.C. §§ 78a–78jj; Public Utility Holding Company Act of 1935, 15 U.S.C.

§§ 79–79z–6; Trust Indenture Act of 1939, 15 U.S.C. §§ 77aaa–bbbb; Investment Company Act of 1940, 15 U.S.C. §§ 80a–1–80a–52; Investment Advisers Act of 1940, 15 U.S.C. §§ 80b1–21.

**9.** *See* n. 5, *supra*.

The Commission exercising its expertise under applicable statutory authority made a

judgment which we cannot disturb.[10] I would affirm.

**10.** For an additional discussion of the fairness standard under the Act, *see Harriman et al. v. E. I. DuPont de Nemours and Co.*, 411 F.Supp. 133, Civil No. 4721 (D.Del., December 23, 1975).

## APPENDIX I

### General Information About Investment Companies

**TABLE 5** — **Year-End Discounts and Premiums**

| | 1974 | 1973 | 1972 | 1971 | 1970 | 1969 | 1968 | 1967 | 1966 | 1965 | 1964 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Diversified Companies** | | | | | | | | | | | |
| *Adams Express Co. | 25% | 14% | 14% | 15% | 6% | P 6% | P10% | 6% | 6% | 12% | 10% |
| Advance Investors | 22 | 21 | — | — | — | — | — | — | — | — | — |
| *Carriers & General | 16 | 19 | 17 | 20 | 18 | 14 | 12 | 21 | 19 | 11 | 6 |
| Consolidated Investment Trust | 6 | 4 | 4 | 2 | 2 | 4 | P 1 | 1 | 10 | 21 | 14 |
| *General American Investors | 13 | 17 | 4 | 12 | 8 | P 8 | P14 | P 1 | 11 | 7 | 6 |
| ^International Holdings Corp. | 39 | 28 | 27 | 13 | 18 | 10 | 5 | 16 | 25 | 21 | 15 |
| *Lehman Corp. | 22 | 20 | 13 | 8 | P14 | P16 | P23 | P16 | 9 | 11 | 6 |
| *Madison Fund | 29 | 34 | 19 | 3 | P16 | P48 | P32 | P19 | P18 | P 2 | P 3 |
| *Niagara Share Corp. | P 4 | 4 | 7 | 13 | P 5 | P12 | P 8 | 11 | 12 | 8 | 0 |
| *Tri-Continental Corp.‡ | 14 | 13 | 19 | 14 | 5 | 2 | 4 | 16 | 25 | 23 | 24 |
| *U.S. & Foreign Securities | 26 | 21 | 3 | 7 | 3 | 11 | 7 | 17 | 29 | 33 | 26 |
| Diversified Investment Company Average | 20 | 19 | 14 | 12 | 3 | P 6 | P 7 | 6 | 13 | 14 | 10 |
| **Non-Diversified Companies** | | | | | | | | | | | |
| Baker, Fentress & Co. | 58 | 54 | 41 | 14 | — | — | — | — | — | — | — |
| Central Securities‡ | 41 | 40 | 31 | P14 | P37 | P58 | P31 | 3 | P 9 | 11 | P 5 |
| Standard Shares | 38 | 35 | 25 | 23 | 24 | 13 | 6 | 20 | 21 | 16 | 10 |
| United Corporation | 25 | 24 | 28 | 26 | 15 | 14 | 7 | 12 | 20 | 24 | 19 |
| **Specialized Companies** | | | | | | | | | | | |
| American General Conv. Sec. | 3 | 10 | 4 | — | — | — | — | — | — | — | — |
| ASA Limited | 9 | P26 | 6 | P10 | P37 | 15 | P54 | P77 | P12 | P 5 | 10 |
| Bancroft Convertible Fund | 22 | 31 | 29 | 14 | — | — | — | — | — | — | — |
| Bayrock Utility Securities | 17 | 24 | 5 | — | — | — | — | — | — | — | — |
| Castle Convertible Fund | 23 | 29 | 21 | 9 | — | — | — | — | — | — | — |
| Chase Convertible Fund | 14 | 19 | 15 | — | — | — | — | — | — | — | — |
| CNA-- Larwin Investment Co.‡ | —** | 1 | — | — | — | — | — | — | — | — | — |
| Diebold Venture Capital Corp. | 69 | 68 | 50 | 41 | 48 | 25 | 7 | — | — | — | — |
| Drexel Utility Shares | 5 | 17 | 19 | — | — | — | — | — | — | — | — |
| Highland Capital Corp. | 67 | 74 | 45 | 47 | 37 | 34 | — | — | — | — | — |
| Japan Fund | 43 | 31 | 8 | P 7 | P11 | P 6 | P 5 | 9 | 32 | 27 | 32 |
| Keystone OTC Fund | 39 | 50 | 26 | — | — | — | — | — | — | — | — |
| National Aviation | 43 | 39 | 27 | 15 | 12 | 15 | P26 | P33 | P14 | 2 | 10 |
| New America Fund | 58 | 47 | 33 | 58 | 47 | 41 | 0 | — | — | — | — |
| Petroleum Corp. | 10 | 8 | 4 | 14 | 3 | P 4 | P 7 | 3 | 0 | P 6 | 3 |
| Precious Metals Holdings | 27 | — | — | — | — | — | — | — | — | — | — |
| RFIT Income Fund‡ | P34 | P10 | P 5 | — | — | — | — | — | — | — | — |
| S-G Securities‡ | P375 | P 2 | — | — | — | — | — | — | — | — | — |
| Source Capital‡ | 45 | 49 | 53 | 42 | 33 | 32 | P 3 | — | — | — | — |
| Value Line Development Capital Corp. | 70 | 66 | 41 | 49 | 36 | 20 | P18 | — | — | — | — |
| **Bond Funds** | | | | | | | | | | | |
| American General Bond Fund | P 1 | P 6 | P11 | P 9 | — | — | — | — | — | — | — |
| Bunker Hill Income Securities | 2 | 10 | — | — | — | — | — | — | — | — | — |
| Circle Income Shares | P 3 | P 1 | — | — | — | — | — | — | — | — | — |
| CNA Income Shares | 18 | 8 | — | — | — | — | — | — | — | — | — |
| Current Income Shares | 7 | 15 | — | — | — | — | — | — | — | — | — |
| Drexel Bond-Debenture Trading Fund | 13 | 20 | 5 | P 4 | — | — | — | — | — | — | — |
| Excelsior Income Shares | 13 | 9 | — | — | — | — | — | — | — | — | — |
| Federated Income & Private Placement | 8 | 3 | 4 | — | — | — | — | — | — | — | — |
| Fort Dearborn Income Securities | 5 | 9 | P 5 | — | — | — | — | — | — | — | — |
| John Hancock Income Securities | 10 | 7 | — | — | — | — | — | — | — | — | — |
| John Hancock Investors | 12 | P 1 | P 5 | P 6 | — | — | — | — | — | — | — |
| Hatteras Income Securities | 1 | 1 | — | — | — | — | — | — | — | — | — |
| INA Investment Securities | 17 | 19 | — | — | — | — | — | — | — | — | — |
| Independence Square Income Securities | 8 | P 5 | P 3 | — | — | — | — | — | — | — | — |
| Lincoln Nat Direct Placement Fund | 26 | 23 | P 8 | — | — | — | — | — | — | — | — |
| MassMutual Corporate Investors | 39 | 23 | 2 | 1 | — | — | — | — | — | — | — |
| MassMutual Income Investors | 13 | 10 | P 8 | — | — | — | — | — | — | — | — |
| Montgomery Street Income Inv. | 2 | 12 | — | — | — | — | — | — | — | — | — |
| Mutual of Omaha Interest Shares | 12 | 13 | 4 | — | — | — | — | — | — | — | — |
| Pacific-American Income Shares | 8 | 14 | — | — | — | — | — | — | — | — | — |
| Paul Revere Investors | 26 | 39 | 9 | 5 | — | — | — | — | — | — | — |
| St. Paul Securities | 11 | 15 | P 8 | — | — | — | — | — | — | — | — |
| S & P/Intercapital Income Sec. | 0 | 14 | — | — | — | — | — | — | — | — | — |
| State Mutual Securities | 11 | 18 | -- | — | — | — | — | — | — | — | — |
| Transamerica Income Shares | 17 | 14 | P 6 | — | — | — | — | — | — | — | — |
| USLIFE Income Fund | P 2 | 11 | P 7 | — | — | — | — | — | — | — | — |
| Vestaur Securities | 1 | 0 | P 7 | — | — | — | — | — | — | — | — |

\* Companies included in the Diversified Investment Company Average
\*\* Negative net asset value
‡ Common Stock
P Premium.

## APPENDIX II

### EFFECTS UPON CHRISTIANA COMMON STOCK OF VARIOUS DISCOUNT VALUES AND DIVIDEND POLICIES. *

| | MERGER AT SPECIFIED PERCENTAGE OF ADJUSTED NET ASSET VALUE (a) | | | |
|---|---|---|---|---|
| | 100% | 97.5% | 87.9%(h) | 76.9%(i) |
| Exchange ratio, number of DuPont common for one Christiana(g) | 1.152 | 1.123 | 1.012 | 0.884 |
| Earnings per share(b) | $8.42 | $8.26 | $7.65 | $6.91 |
| Percent change from 1971(c) | +59.5% | +56.4% | +44.9% | +30.9% |
| Dividends per share, 68.6 percent payout (d,e) | $5.78 | $5.67 | $5.25 | $4.74 |
| Percent change from 1971(c) | +10.0% | +8.0% | 0% | -9.7% |
| Dividends per share, 74 percent payout (d,e) | $6.23 | $6.11 | $5.66 | $5.12 |
| Percent change from 1971 | +18.7% | +16.4% | +7.8% | -2.5% |
| Premium, April 28, 1972(f) | | | | |
| Percent | +31.9% | +28.5% | +15.8% | + 1.2% |
| Total | $548,278,380 | $491,208,370 | $272,045,010 | $20,954,995 |
| Premium, July 17, 1972(f) | | | | |
| Percent | +13.1% | +10.3% | -0.6% | -13.2% |
| Total | $257,634,440 | $201,836,500 | -$12,442,218 | -$257,935,970 |

* See assumption on following pages, referenced by letters (a) through (i) on this table.

# APPENDIX II—Continued

## EFFECTS UPON DUPONT COMMON STOCK OF VARIOUS DISCOUNT VALUES AND DIVIDEND POLICIES *

MERGER AT SPECIFIED PERCENTAGE OF ADJUSTED NET ASSET VALUE (a)

| | 100% | 97.5% | 87.9%(h) | 76.9%(i) |
|---|---|---|---|---|
| Earnings per share(b) | $7.31 | $7.36 | $7.56 | $7.82 |
| Percent change from 1971(c) | -0.3% | +0.4% | +3.1% | +6.7% |
| Dividends per share, 68.6 percent payout(d,e) | $5.01 | $5.05 | $5.19 | $5.36 |
| Percent change from 1971(c) | +0.2% | +1.0% | +3.8% | +7.2% |
| Dividends per share, 74 percent payout(d,e) | $5.41 | $5.44 | $5.59 | $5.79 |
| Percent change from 1971(c) | +8.2% | +8.8% | +11.8% | +15.8% |
| Net number of DuPont common to be issued (retired) | 110,696 | (188,501) | (1,491,108) | (2,983,470) |
| Market value of net shares(j) April 28, 1972 | $18,624,602 | ($31,715,293) | ($250,878,920) | ($501,968,820) |
| July 17, 1972 | $18,209,492 | ($31,008,414) | ($245,287,260) | ($490,780,810) |

* See assumptions on following pages, referenced by letters (a) through (j) on this table.

Assumptions

A. Adjusted net asset value as shown in DuPont Exhibit No. 5, pp. 6 and 7. Christiana's holding of DuPont common stock is valued at $163.875, the average of the closing prices on the New York Stock Exchange, July 10 through 14, 1972. This value is also used to compute the number of DuPont shares to be issued to preferred and common stockholders of Christiana.

B. Earnings per share are based on net income of DuPont after the merger, calculated at $347.6 million:

| | | |
|---|---:|---:|
| Actual 1971 net income earned on common stock | | $346,500,000 |
| Earnings of 4.46 percent on Christiana assets to be redeployed by DuPont: | | |
| Wilmington Trust Co. share | $ 2,699,424 | |
| News-Journal Co. share | 24,260,000 | |
| Cash, less current liabilities | 5,981,367 | |
| Claim for tax refund | 11,723,013 | |
| | 44,663,804 | |
| Less adjustment for handling tax refund claim | 12,723,013 | |
| Less expenses and taxes on sale of assets | 7,619,606 | |
| Less merger expenses | 1,500,000 | |
| | $22,821,185 | 1,017,825 |
| Preferred dividends saved by retiring Christiana's holding of 16,256 DuPont preferred shares, 16,256 × $4.50 | | 73,152 |
| | | $347,590,977 |

Values of Christiana assets are from DuPont Exhibit No. 5, pp. 4 and 6. The full amount of merger expenses is shown because these reduce the total extra assets available to DuPont. (4.46 percent is shown in Division's Exhibit 12, Exhibit 4—Kidder, Peabody).

C. Percentage changes in earnings and dividends per share are based on Christiana's 1971 earnings per share of $5.28 and dividend per share of $5.25, and

DuPont's earnings per share of $7.33 and dividend of $5.00.

D. Payout ratios for DuPont of 68.6 percent and 74 percent are based on data for the previous five years. 68.6 percent is the average of the three lowest ratios; 74 percent approximates the highest ratio.

| | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| Payout ratio (%) | 74.3 | 68.8 | 68.9 | 72.9 | 68.2 |

These data are computed from DuPont Exhibit No. 5, pp. C–3.

E. In these tables, dividends are maintained at specified proportions of earnings. These dividends change as earnings vary with differing discounts.

F. The computation of the premium, or increase in market value of Christiana shares, is based on the closing market price for DuPont and the closing bid price for Christiana on April 28, 1972, the day that merger discussions were announced, and July 17, 1972, the day the proposed merger terms were announced.

G. Shown to three decimal places; calculations done with six or more decimal places. Formula for computation:

$$XR = \frac{\frac{[ANAV\,(1-d)] - 120\,CP}{DCSP}}{CCS}$$

where
- $ANAV$ = adjusted net asset value ($2,223,425,827)
- $CCS$ = number of shares outstanding of Christiana common stock (11,710,103)
- $CP$ = number of shares outstanding of Christiana preferred stock (106,500)
- $d$ = discount from adjusted net asset value (stated as a decimal)
- $DCSP$ = price of DuPont common stock ($163.875)
- $XR$ = exchange ratio (number of DuPont common for one Christiana).

H. 87.9 percent is shown because this is the percentage at which the dividend to Christiana common stock is the same before and after the merger.

I. 76.9 percent is shown because it portrays the effect of a 23.1 percent discount. This was the discount on April 28, 1972, based on mean market price and net asset value of Christiana (see Applicants' Joint Exhibit 1B, Exhibit 9—Morgan Stanley).

J. The market value of the net shares of DuPont to be issued or retired is computed using the closing market value for DuPont on April 28, 1972 and July 17, 1972.